Thank you. Your Honor, if I may ask the Court, we have three issues before the Court. The first is withholding of removal, the second is convention against torture, and the third is cancellation of removal. Would it please the Court to tell me which the Court would like me to address first, or all three at a time? I think it's entirely up to you. Thank you, Your Honor. Of your issues, the one that's of most interest to me personally is the cancellation of removal issue on continuous presence. But I have no idea what issue or issues may be in the minds of my colleagues. Then I will address the cancellation of removal first, Your Honor. Your Honor, the cancellation of removal is statutory, 10 years continuous residence, good moral character, and also exceptional and unusual hardship. The Court did not contest the good moral character, nor the exceptional and unusual hardship. What the Court did contest was the period from September 1999 to mid-summer of 2000. And the Court did this. If I could just ask a clarifying question. Now, maybe I've got this wrong, but as I read it, I thought that the IJ, the immigration judge, had questioned the character for not paying taxes, but that the BIA did not rely on that in their opinion, which is what we review. So that under Chenery, we couldn't review or base a decision on moral character. We just have to review whether their continuous presence ruling. Excuse me. That is correct, Your Honor. That's why I stated that. That was not the issue that I'm addressing. The issue was the period between September 1999 to mid-2000. And, you know, in a way, Mr. Lee came to the United States in 1997. He was apprehended in 2007. So throughout that period, he contended he was in the United States. We had his sister who was incarcerated at the Northwest Detention Center at the time of the hearing. Prior to that time, I had made two inquiries to the Northwest facility to have her made available by telephone to testify to the Court. On the second inquiry, we had set it up, they had assured us she'd be ready, and when the time came for us to have her testify, they said they couldn't put her on because they didn't have enough people to watch her or take her there. And with that, the immigration judge said, you know, she was not made available to us. Well, it was the government that did not make her available. So she had testimony as her sister. She lived first in New York City. Counsel? Yes. Counsel? Yes, Your Honor. It's my understanding there were two hearings, were there not, and she was not detained during the second hearing? That is correct, Your Honor. The second hearing, she had a fever and could not appear, but she had executed a declaration, signed declaration in the state of Washington, attesting to the presence of her brother. Your Honor, she was here in 1997. So you're saying she was not available and that I.J. knew that she was not available because of that? Yes, Your Honor. It's in the statements that was provided to the Court, and I believe the Court did make the statement that she had a fever and was not available at the second hearing. All right. And, Your Honor, just for the Court's information, she came first before 1997, was living in New York City. The brother went to New York City and traveled with them after two years to Seattle where they had more relatives. And throughout this period of time, Mr. Lee was in the United States. For him to have left the United States to go outside and back to China and then come back in would have been insane. It took him almost two months through three countries, five countries, to get to the United States. He had to pay snake heads money, and this would have been repeated. And for the judge to say that he left the United States Well, the judge did not say he didn't leave the United States. He left the United States, but he didn't. What he did say was he was not present. The government did not offer any evidence that he had left the United States and returned. There was some confusion, wasn't there, about whether he had entered? Yes, Your Honor, there was. He entered in? went to Toronto, came down through New York to be with his sister. Now, at the 2000 hearing, through a telephone interpreter, which this court has held, is very suspicious at times and not hold much validity. They interpreted for him in a somewhat different dialect of Chinese, but they never told him what they had received from the interpreter. It was kept by the officer. An officer had put that he had come to blame Washington. He did not. My paralegal had incorrectly, by scurvy of his error, said that he entered Washington on the particular date. And so the officer assumed that this meant that he came through blame Washington. Mr. Lee never stated that he never heard or knew of blame Washington. Is it at all possible that at that time he could have gone up to Washington and then entered? It's always possible, but then you'd have to try to evade Canadian immigration, then evade American immigration to come back, but for what purpose? He has no relatives there. The jobs are down here. There's nothing that he needs out there. He spent big bucks to come here, Your Honor, not to go to Canada. If he went up to Vancouver for a day or two, that kind of short absence doesn't necessarily block continuous presence under our presence. Well, that's correct for short absences, but you'd be taking a chance that you'd be incarcerated and then immediately deported on the expedited deportation. So with that, Your Honor, the government did not provide any evidence that he had left the United States. When he came here, he went from China first to Indonesia or Hong Kong? Hong Kong, Indonesia. He spent a month there. Then he went to, I think, Russia. Then he went down to, I believe, Mexico, and then he flew up to Vancouver. It's a roundabout trip, but that's how the snakeheads got him to go that way, Your Honor. If I may address the convention of torture, Your Honor, I think this is the most egregious statement where the court made, saying that, and I quote, the court considers the act of a sterilization procedure conducted under medical auspices not to be the nature of torture as envisioned in the torture convention. But that's what the IJ said. Yes. The BIA did not say that. Right. But they still upheld the IJ's decision, Your Honor. Right, but in their decision they don't use that rationale, so I don't think we would know. Well, the underlying rationale is what the BIA is supporting, Your Honor, and this is part of the argument. And that's how they held that the convention against torture did not apply. He has two children here. Counsel? Yes. Counsel, just to clarify that. My understanding is the BIA really was affirming Catt on the ground that it hadn't established that he would be sterilized upon return, not that it wasn't torture, and therefore that he was not facing the risk of sterilization, regardless of whether it was torture. They didn't reach that question. Your Honor, the question was. The primary ground was that he hadn't carried his burden to show that he would be sterilized. Well, sometimes you can't prove a negative, Your Honor, but you can prove a positive. It's been shown through. Whether or not, and in this case on the primary ground of persecution, if he were to go back, regardless of Catt, that he would have been sterilized. I think the BIA said that there wasn't sufficient evidence that somebody with two U.S.-born children would be subject to sterilization in China if he and his wife went back there. So if that's the case, then there's no action against him to be considered torture. Well, Your Honor. Or to be considered persecution. In the court records, there is a letter from the local government stating that if he returns to China, he will be sterilized. His mother was sterilized, and we had affidavits from various people in China that stated that they had been sterilized because of the two-child policy. He doesn't have one child. He has two children. And the most that I've heard that the government will allow is two children in certain rural areas. However, him coming back with already two children would make him a very good candidate for sterilization. I cannot say that the government will 100 percent do it, but I can say with good knowledge that they still do sterilizations for people that have one child. We've had clients of that nature, Your Honor. So for me to prove a negative, I cannot do that. But for me to offer evidence that the Chinese government is still, in fact, they just reenacted that policy a year ago that the one-child policy stands except for certain rural areas. So that is a good indication that, you know, he could be a likely candidate having two children and not being able to make a third. I wasn't aware of evidence in the record that the Chinese government had implemented a sterilization policy against a person who had two kids when they were outside of China in the U.S. Well, it's a broad policy. If you have more than one child, you're supposed to be sterilized. So take it from there, Your Honor. Whether you're here in the U.S. or wherever you procreate, if you bring it back, you've got two children, not one. I'm afraid your time is up. We'll give you an extra minute for your rebuttal. Thank you very much, Your Honor. Okay, Ms. Jones. Good morning, Your Honor. Thanks for coming all the way from Washington, D.C. I think you probably get the prize today for the person who came the farthest. Maybe. I'm not sure, but I'm enjoying it so far, though. So thank you for having me. Your Honor, if I could address Petitioner's argument regarding cancellation of removal first. Petitioner has the burden to establish that he has been in the United States, had a continuous presence in the United States since 1997. And the immigration judge pointed out in several cases that there are absences that were un- there were inconsistencies and absences that he couldn't account for. At the record at page 105, the immigration judge talked about the fact that his witness couldn't confirm his presence from September of 1999 until mid-2000. There's also the evidence that he was able- he was unable to provide sufficient evidence regarding his continuous presence from February of 1997 until 1999. And with regard to his sister, the immigration judge noted on 106 that it was her child that was suffering a fever, and the fact that Petitioner never requested a continuous if the sister's testimony was so vital and so important to his case. So the immigration judge did note that. And again, he has the burden to establish the continuous presence from the issuance of the NTA, which was in 1997 to 2007. He was unable to do that. With regard to his CAT claim, Petitioner, I think, is a little bit confused on exactly what the board said and what the immigration judge said and what was being reviewed. What the board said was that he was unable to establish his entitlement to CAT because he never provided any sufficient evidence that he would be subjected to torture if he was returned to China. That's it, point blank, period. They never went into discussion whether or not coerced sterilization was torture or not. The immigration judge did do that, but that's a legal determination that the board didn't adopt, and it's very specific in its decision that it didn't do so. With regard to that, I don't think that there's any need to further discuss CAT because he provided no evidence that he'd be subjected to torture, point blank, period, regardless of whether or not you think that coerced sterilization constitutes torture or not. So without that minimal evidence, there's no need to go into the legal definition of what is and what is not torture. Which takes us to his withholding of removal claim, which is the fact that he feels that he's entitled to that form of relief because he feels that he has provided evidence that there's a clear probability that he will be subjected to this. But that's to the contrary. Petitioner mentioned in his argument that there's a letter in the record at page 463. Well, that letter doesn't say anything about him or the fact that he had two children in the United States. That letter also, the board and immigration judge said that that letter is foreclosed by the board's presidential decision in matter of JWS, which concluded that the Chinese government does not have a national policy requiring forced sterilization of a parent who returns with a second child born outside of China. And this court has also acknowledged that decision in Lin versus Holder in 2009. So for him to say that there's this broad policy, he has to understand that in order to be entitled to withholding of removal, he had to either establish that he'd be singled out individually for persecution or that there's a systematic pattern or practice of persecution against the group that he belonged to. And none of the evidence he provided provides that. The letters from his mother and the neighbors were, one, unauthenticated, but even if they weren't, which both the immigration judge and the board said, even if they were assumed to be credible evidence, these individuals were not similarly situated to the petitioner.  Nor these individuals said that they had any children. So he provided no evidence that he belonged to a group that has been systematically persecuted in China. That's all I pretty much have, if anyone has any questions. I understand. Go ahead, Judge. Go ahead. Okay, so I understand on withholding and CAT, basically what the BIA said and what you're saying today is there's a failure of proof. He just didn't present evidence he would be sterilized or persecuted. That's correct. Upon return because of kids in the U.S. So I'm still sort of where I started, most concerned on cancellation. On that, I just want to clarify that legally, if we were to decide adverse to the government on continuous presence, am I right that under Chenery we couldn't reach an alternative ground about moral character? In other words, if the evidence, if there isn't substantial evidence to support the idea that he was out of the country, then we send it back to the BIA. That's correct. The immigration judge did on page, I believe it's on page 109 of the record, discuss the fact that he failed to file tax return. But the immigration judge was very specific in saying that he was going to not make that ruling, that overall ruling and actually just stick with continuous presence. The BIA certainly didn't say anything about that. So we couldn't get into that. Now on continuous presence, what affirmative evidence is there that he left the country? And what I sort of got reading the briefs and the record part was I thought that there were a couple of forms like an I-230 that someone filled out. And there's a 213, which is the form that when he was apprehended in 2007, there was an interview that was conducted. And that interview, that's when he said that he had entered in May of 1999. So you have various documents within the record that petitioner provided, as well as other documents that were provided, as well as his testimony that provides all these inconsistencies about when he entered, how long he entered, where was he. On those documents, if I could ask Ms. Jones, I thought he gave explanations on those documents that one was a scrivener's error from the law office and that another one was a misunderstanding or mistake of a telephone translator. At the second hearing after he was confronted with the inconsistencies, he offered this explanation, but as this court has held, the immigration judge is not bound by his explanation to accept that explanation, given the fact of all the other inconsistencies. And so the immigration judge, in his opinion, noted that he did say this, but however found that the way his evidence and the fact that he has the burden, he was unable to establish with enough evidence, substantial evidence that he met his burden of establishing that he had been continuously present for the 10 years statutory requirement. You don't mind me putting you through your paces on this argument. That's fine. Apart from those documents, what's the other evidence of his testimony or inconsistencies? Of how the immigration judge reached that decision? Well, you had the sister in her declaration, and the judge even said that the sister was unable to say he was there until 1999, but then it goes on to say that even the sister wasn't able to confirm that he was there from 1997 to 1999. But she said she saw him every day. Until 1999, but not from 1997 to 1999. There's that inconsistent, that's the record on 105, that he claims that he was residing in his apartment with his sister until May of 1999, but that the sister wasn't able to confirm the fact that he had never left, which is on page 106. So you have, within his own witnesses, inconsistent testimony with regards to where he was at certain time periods. Why would he have, just speaking hypothetically, why would someone in his position have left the country? To visit a friend? There's a lot of, I don't want to say that he had some sort of nefarious reasons for doing that, but who knows what, I don't really know, but he could have. The fact of the matter is that just as easily as he snuck in, he could have easily snuck back out and thought he could sneak back in. Maybe there was some sort of criminal activity? I'm not disparaging Petitioner, but again, I don't know. But the fact that he has the, it's his burden to establish it. To persuade us that the record compels the conclusion, right? Right, exactly. His presence was continued. Right, and the fact of the matter, he's only focusing on one of the aspects of the immigration judge's decision. The immigration judge noted various inconsistencies with regards to his absences at various different points throughout his time, and so he really hasn't provided that compelling evidence that the court should overturn the agency's decision. I noticed that the IJ did not make an explicit adverse credibility determination, even though Petitioner apparently changed his testimony on employment a couple of times. Right. What weight do we give to that? Because there is no explicit adverse credibility, and also the board never discussed that, you know, you could just say it's part of the immigration judge's analysis of, you know, he was struggling with the fact that he was presented with so many inconsistencies from Petitioner, and the fact of the matter, even at the end of the day, giving him a repeated opportunity to explain himself, he was still unable to provide enough evidence to sufficiently support that he had been in the United States for the 10-year period. Okay. What did he need to present additionally? Consistent testimony that he'd been here for a 10-year period. I mean, if he had provided evidence, employment records, his witnesses were actually, you know, willing to testify that, yes, he has been here for 10 years, perhaps the immigration judge would have determined that you have met that initial threshold. Testify to that is just that you say that she didn't, in her declaration, she didn't go further and say that he never left the country. Right. And so, and the fact of the matter, she was available to testify. How would anybody know if anybody, you know, he well could have left the country. She wouldn't know. Well, that's the whole point is you're going to provide. How do you do that? You're going to provide enough, you're going to provide a witness for you to provide evidence that you've been here for 10-year periods, which is the initial threshold for cancellation or removal, and you aren't able to provide that, that's your burden to do. Did he testify himself? He did, and he provided inconsistent testimony as well. Did he tell that he never left? He claimed that he, initially he said he did, and then he claimed that he didn't leave, that he had been there since 97, and then when he was confronted with the I-213 form when he had been apprehended, he claimed that he didn't know where that place was, that he never said that, so his testimony was muddled and all over the place with regards to what, and you add that with the fact that he had no other documentary evidence to establish his presence and the evidence that was in the record contradicted it, then that's when the English judge weighed against it and determined that he didn't meet the 10-year requirement. Ms. Jones, your time is up. Thank you. We'll take over with our questions, and we're giving Mr. Wang an extra minute, so it should be about even overall. Okay, thank you. First, excuse me, the judge really in his findings said that he doesn't care about any other time except September 1999 through mid-summer 2000, so all this extraneous thing is irrelevant, I believe, and the court has held that an applicant's testimony is extremely important, and sometimes that's the only basis for it. The court said, Where's your income tax return? Where's your records of employment? He explained where he worked. He explained that he was working under the table, and there was no way that he could prove through documentary evidence except his testimony that he was here in the United States. In fact, he did state that, one, you know, I didn't work, but then in court he said, Okay, I was afraid that something would happen to me. I did work, and I was in the United States. He never said he had left the United States and reentered again. That was an error on the part of the counsel here. The other part is a systematic counsel. Counsel, are you? You're saying, I don't want to make sure I understand. I understood that the I.J. was concerned about the period from 97 to 99 and that he was troubled because the sister couldn't say more than she had seen him, but that was the period of time that was at issue for the I.J. You gave a different date range. Yes, sir. I'm taking from the transcript and also from the I.J.'s order that stated, The court is satisfied that Mr. Lee was present in the U.S. from February 1999, excuse me, 1997 to September 99, and the court is satisfied Mr. Lee's presence in the U.S. from mid-2000 to the present time. So it was from 1997 to September 1999 the court was satisfied. From 2000, mid-2000 to the present time he was satisfied. It was that period, September 1999 to mid-2000, Your Honor. On the other part about being of a systematic practice of a particular group, if you take it down to the seminal issue, is family practice, excuse me, violation of family practice, what is the seminal level, is it? It's one child family. Anything over one child is the one. I'm sorry, Mr. Wang. Your time is up. Thank you, Your Honor. I've given you some extra. Well, I did ask for an extra to reserve a minute, and then you gave me an extra minute. That's two minutes, Your Honor. Right, but you didn't. That's not the way it works. I'm sorry. The time, the clock ran. You said you wanted to reserve a minute, but you didn't reserve it in your argument. You used your whole ten minutes. Okay. You didn't stop after nine, so I gave you an extra minute. Thank you, Your Honor. Ms. Jones, thanks again. Have a safe trip back. And, Mr. Wang, thank you. The case of Lee v. Holder shall be submitted.
judges: Fisher, Gould, Paez